1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FILED & ENTERED

JAN 04 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Fisher      DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERANDO VALLEY DIVISION

In re:

Roberta Mackey

Debtor(s).

William M. Gordon, Jacquelynn Y. Gordon

Plaintiff(s),

v.

Roberta Mackey

Defendant(s).

CHAPTER 7

Case No.:  1:15-bk-12309-VK
Adv No:   1:15-ap-01221-GM

**MEMORANDUM OF DECISION GRANTING
JUDGMENT TO DEBTOR/DEFENDANT
ROBERTA MACKEY**

    On July 6, 2015, Roberta Mackey ("Roberta" or the "Debtor") filed the above

chapter 7 bankruptcy petition.  At that time there was a pending superior court case

brought by Jacquelynn ("Jacquelynn") and William ("William") Gordon against Roberta

for breach of written contract, fraud and deceit, and financial abuse of elder under

Welfare & Institutions Code §15600 *et. seq*. ("the Superior Court Case").[1]  Relief from

stay was granted to proceed to trial and on December 31, 2015 judgment was entered

against Roberta for $125,000 of compensatory damages and prejudgment interest of

$39,902.62 on the grounds of elder abuse under Welfare & Institutions Code §§

15610.30 and 15657.5(A) (the "Superior Court Judgment").[2]

The present adversary proceeding was filed on October 7, 2015 and sought a

determination that the debt to the Gordons represented by the Superior Court Judgment

would not be discharged under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).  It further

objected to the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2) and 727(a)(4).

On February 2, 2016, Roberta filed a motion for summary judgment and on

February 29, 2016, the Gordons filed their motion for summary judgment.[3]  Hearings

were held before Judge Kaufman, who – in a group of extensive rulings – granted

judgment to the Defendant as to §727(a)(2) and §523(a)(2)(A), but denied it to both

parties as to §727(a)(4) and §523(a)(6).[4] This proceeding was transferred to Judge

Mund on August 8, 2016 and the remaining issues went to trial on October 27 and

November 7, 2016.


## CLAIM FOR RELIEF UNDER §727(a)(4)


Basic Facts and Timeline as to §727(a)(4)

In or about May 2007, Roberta incorporated her business as Roberta Mackey

Insurance, Inc. ("the Agency") and became the sole shareholder and owner of 1,000

---

[1] Los Angeles Superior Court Case No. LC102166.
[2] Ex. 25 and Ex. 26.  (All references to exhibits are to the Gordon's trial exhibits.)
[3] Adv. dkt ## 14 and 22 respectively.
[4] Adv. dkt. ## 58, 59, and 78.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                          **F 9021-1.1.NOTICE.ENTERED.ORDER**

shares of stock.  Roberta was the president and treasurer and her husband Fredric

Robin ("Fred")[5] was the vice-president and secretary.  Both were signatories to the

Agencies' bank account, but there is no evidence that Fred ever participated in the

insurance business.  Roberta was a Life and Heath Agent and in 2012 she decided to

also become a Property/Casualty Agent.

Starting in at least 2010, Roberta's daughter Sarah Robin ("Sarah") began

working for the company and that year Roberta brought Sarah into corporate

governance as vice-president and treasurer - Fred having resigned from those

positions.  The next year Fred was removed as a signatory on the corporate bank

account and Sarah took his place.  By 2013, Roberta decided to make Sarah a

corporate director and – at the annual meeting on May 8, 2013 – she "discussed issuing

stock to Sarah Robin."  This was discussed again at the May 9, 2014 annual meeting

and it was decided that "Roberta Mackey would transfer to Sarah Robin 50% of her

stock (500 shares) in Roberta Mackey Insurance Agency, Inc. to be issued during the

month of May, 2014."[6]  However, according to Roberta's testimony, the corporation did

have the ability to issue additional shares and was not limited to a total of 1,000 shares.

On May 19, 2014, Roberta cancelled her stock certificate and issued two new

ones, each for 500 shares – one to herself and one to Sarah.[7]  This transfer was

partially a gift and partially an incentive to Sarah, who had a very large client from which

the agency may or may not have received part of the commission.  At some point it was

agreed that Sarah would pay part of her commissions to the Agency as compensation

for her stock: she paid $50,650, but this figure was not linked to the actual value of the

---

[5] First names are used throughout to avoid confusion.
[6] Ex. 22.  Note that the stock certificate is labeled "Roberta Mackey Insurance, Inc.," but the minutes are titled "Roberta Mackey Insurance Agency, Inc."  The Court finds – for purposes of this adversary proceeding - that there is no legal significance to this discrepancy.
[7] Ex. 23, 24.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                          F 9021-1.1.NOTICE.ENTERED.ORDER

shares she received.[8]

Roberta filed her chapter 7 petition, schedules, and statement of financial affairs on July 6, 2015.  In her schedules and statement of affairs, she showed that she owned one-half of the Agency, but did not list the transfer of her other one-half interest to Sarah even though it had taken place within two years before the bankruptcy was filed.

At the §341(a) meeting, Roberta told the Trustee about the details of the transfer of stock.  She had also revealed these to her attorney, who met with her twice - for about two hours each time - while preparing her bankruptcy filing.  Her attorney knew that the Trustee would be interested in the transfer of stock as a possible asset, but he either failed to ascertain the date or simply missed adding it to the schedules and statement of affairs.  Her attorney told the Trustee about the transfer during a conversation a week before the §341(a) and provided the Trustee with documentation. The Trustee decided not to pursue the transfer.

Because the transfer was discussed at the §341(a) meeting, Debtor's counsel felt there was no need to amend the schedules, although he might have done so had he been aware of the $50,000 amount.


Law and Analysis as to §727(a)(4)

11 U.S.C. § 727 provides, in part:

> (a)  The court shall grant the debtor a discharge, unless-
>     (4)  the debtor knowingly and fraudulently, in or in connection with the case-
>         (A) made a false oath or account.

Thus, §727(a)(4(A) denies a discharge to a debtor who "knowingly and fraudulently" makes a false oath or account in the course of the bankruptcy case.  *Id.*  A false

---

[8] Testimony of Roberta and ex. 44.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                          **F 9021-1.1.NOTICE.ENTERED.ORDER**

statement or an omission in the debtor's bankruptcy schedules or statement of financial

affairs can constitute a false oath. *Khalil v. Developers Surety and Indemnity Company*

*(In re Khalil),* 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007)(citing *Searles v. Riley (In re*

*Searles),* 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004)), *aff'd*, 578 F.39 1167 (9th Cir. 2009).

"The fundamental purpose of §727(a)(4)(A) is to insure that the trustee and creditors

have accurate information without having to conduct costly investigations." *Id. (*quoting

*Fogal Legware of Switz., Inc. v. Wills (In re Wills),* 243 B.R. 58, 63 (B.A.P. 9th Cir.

1999)). "That said, a false statement or omission that has no impact on a bankruptcy

case is not material and does not provide grounds for denial of a discharge under

§727(a)(4)(A)." *Id.*

For discharge to be denied, the Gordons must show by a preponderance of the

evidence that: (1) Debtor made such a false statement or omission, (2) regarding a

material fact, and (3) did so knowingly and fraudulently. *Id.*

Here, the first element, the Debtor's omission, has been satisfied. When Roberta

filed her bankruptcy schedules, she included the fact that she owned one-half of the

Agency. However, she failed to list the prior transfer of her other one-half interest to her

daughter Sarah. Other transfers were noted in the schedules and statement of financial

affairs; however this transfer was not listed nor were amended schedules ever filed to

reflect the transfer to Sarah.

The second element, that the omission relates to a material fact, is arguably

satisfied, as well. A fact is material "if it bears a relationship to the debtor's business

transactions or estate, or concerns the discovery of assets, business dealings, or the

existence and disposition of the debtor's property." *Khalil v. Developers Sur. &*

*Indemnity. Co., 379 B.R. at 173 (*quoting *Wills,* 243 B.R. at 62). Since the transfer

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9021-1.1.NOTICE.ENTERED.ORDER**

relates to shares of Debtor's business, the Court finds the omission of the transfer is a material fact.

The third element of intent asks whether Roberta, when she filed her bankruptcy schedules and statement of financial affairs, *knowingly* and *fraudulently* omitted the transfer of the shares to Sarah.  "A debtor 'acts knowingly if he or she acts deliberately and consciously.'" *Id. (*quoting *Roberts v. Erhard (In re Roberts),* 331 B.R. 876, 883 (B.A.P. 9th Cir. 2005)). In this case, there is no evidence that Roberta made a deliberate attempt to omit the transfer to her daughter. In her schedules, Roberta clearly disclosed she owned 50% of the corporation. She did not attempt to hide the fact that someone else owned the remaining 50%. She had told her attorney about the transfer, although he did not include it in her schedules. Her attorney told the Trustee about the transfer at her §341(a) meeting and the Trustee was able to collect sufficient information about the corporation and whether to pursue the assets of the corporation.  Therefore, the Court finds that the Gordons have failed to satisfy this third element under §727(a)(4)(A).  The Gordons' request to deny Roberta's discharge under §727(a)(4)(A) is denied.

## CLAIM FOR RELIEF UNDER §523(a)(6)

Basic Facts and Timeline as to §523(a)(6)

In December 2004, Roberta Mackey married Fred Robin.  In 2007, Roberta met the Gordons.  Fred and William Gordon became quite friendly and the two couples socialized on a regular basis, having dinner together once or twice a month.  In the spring of 2012, Fred approached William for a loan.  Fred told William that he would repay the loan with interest in August.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9021-1.1.NOTICE.ENTERED.ORDER**

Although the purpose of the loan was not specifically discussed in the bankruptcy trial, it clearly was intended to be a business loan for Fred.

A note was created and William insisted that both Fred and Roberta sign it. William appears to have given the check to Fred before the note was signed, but it was understood that cashing it was contingent on William receiving the note signed by both Fred and Roberta.[9]

The check was made out to Fred, who endorsed it to Roberta[10] and obtained her signature on the note. The money went into Roberta's personal account, from which she disbursed some $70,000 to or for the benefit of Fred's business.[11] The parties stipulated that on August 1, 2012 – the date that the loan was due – some $30,000 of the original $100,000 remained in Roberta's bank account.

It appears from the evidence that although the loan came due in August 2012, the Gordons did not insist on immediate repayment.  No part of the money was repaid and on June 9, 2013, the Gordons sent a letter to Fred and Roberta demanding repayment of the $100,000 loan, giving Fred and Roberta until June 17, 2013 to do so, and threatening legal action if they failed to repay.[12]  There is no response on the record and no part of the loan was repaid.  Nonetheless, on April 25, 2014, the Gordons made a further loan of $10,000, with another $10,000 loan on May 2, 2014 and yet another $5,000 loan on May 30, 2014.  The April 25 and May 2 loans are memorialized in promissory notes signed by Fred and Roberta and the May 30 loan is evidenced by a copy of a check made payable to Fred and endorsed by him to Roberta.  These three

---

[9] Ex. 1.
[10] Ex. 2 – this check was signed by William on his personal account at East West Bank.
[11] Ex. 19 shows that Roberta wrote checks for Fred's business expenses as follows: 4/30/12 $316; 4/30/16 $10,180.40; 4/30/16 $615; 5/2/12 $6,000; 5/8/12 $5,000; 6/11/12 $1,500; 6/13/12 $10,000; 6/21/12 $3,000; 7/2/12 $2,500; 7/9/12 $1,500; 7/11/12 $1,000; 8/3/12 $1,000; 8/28/12 $18,5000; 8/29/12 $1,500; 10/1/12 $1,500; 10/4/12 $300; 10/5/12 $5,000.
[12] Ex. 6.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9021-1.1.NOTICE.ENTERED.ORDER**

loans appear to have been due on June 15, 2014.[13]

Once again there was no repayment and on July 29, 2014, Fred filed for

bankruptcy.[14]  On August 25, 2014, the Gordons' attorney sent a demand letter to

Roberta for repayment of all four loans.[15]  Roberta responded that she was never a

borrower, but merely a witness to Fred's signature.  She denied having been part of any

discussions concerning these loans and threatened suit for harassment.[16]

On September 24, 2014, the Gordons filed the Superior Court Case against

Roberta.[17] And on September 30, 2014, the Gordons filed an adversary complaint in the

bankruptcy court against Fred seeking to have the debt declared nondischargeable, for

which judgment was granted to the Gordons on November 19, 2015.[18]

Roberta filed her bankruptcy case on July 6, 2015 and the Superior Court Case

proceeded to trial after relief from stay was granted.  The Superior Court Judgment was

rendered orally on November 9, 2015[19] and the written order was filed on December 31,

2015.[20]  This adversary proceeding was filed on October 7, 2015.

Jacquelynn Gordon's testimony was admitted through her deposition (Ex. 41),

the trial transcript in the Superior Court case (Ex. 42), and the bankruptcy trial transcript

in the case of Gordon v.Robin (ex. 43).  For ease, relevant sections are set forth herein:

---

[13] Ex. 3, 4, and 5.  The two $10,000 checks were signed by Jacquelynn Gordon and were drawn on the
Seascamp Account at U.S. Bank.  Ex. 10, 11. The $5,000 check was also signed by Jacquelynn Gordon
and drawn on the California Western Realty Inc, dba Towne and Country Real Estate, California Business
Investments account at Bank of America.
[14] 1:14-bk-13578-VK.
[15] Ex. 7.  Fred had already filed bankruptcy, so this demand letter was addressed solely to Roberta.
[16] Ex. 8.
[17] Los Angeles Superior Court LC102166.
[18] 1:14-ap-01169-VK.
[19] Ex. 25.
[20] Ex. 26.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    F 9021-1.1.NOTICE.ENTERED.ORDER

**Ex. 41**
**Gordon v. Mackey, Superior Court LC102166**
**Deposition of Jacquelynn Gordon, June 11, 2015**

Q.  How long have you known Ms. Mackey?
A.  I can't remember.
Q.  What is your relationship with Ms. Mackey?
A.  I would say casual friend.
Q.  Casual friend?
A.  Casual friend.
Q.  What about your relationship with Fred?
A.  Same.  [20:11-19]

Q.  Okay.  Do you know what the purpose of this loan was for, why they needed the money?
A.  I have no idea.  [30:12-14]

Q.  Was there any discussion about where Mr. Robbin [sic] and Ms. Mackey were going to get the money to repay you?
A.  There was no discussion, no.
Q.  Okay.  So the money was just loaned, you had no idea how it was going to come back to you?
A. No.  [30:22-31:3]

Q.  So – so you don't believe that inherent in any loan that there is a risk of not being paid back?
A.  Fred Robbin [sic], I remember him telling me that, don't worry, that there was a million dollars sitting in the bank in Santa Monica under the Robbins Brothers business. [31:13-19]

Q.  How did your trust for Ms. Mackey develop?
A.  There was no trust to develop because my husband was the one that did the negotiating – loaned the money to Mr. Robbin [sic]. [37:7-11]

Q.  Okay.  So how much time passed between that note being signed and the money being transferred?
Mr. Bowen:  We are now talking about the hundred thousand dollar note?
By Mr. Taran:
Q.  Yes.
A.  I believe they immediately went to Santa Monica and deposited the check, the $100,000 check in the commercial bank with their Robbins Brothers business.
Q.  It was in a Robbins Brothers business account?
A.  Huh?
Q.  Robbins Brothers business account?
A.  Yes.
Q.  Not Ms. Mackey's personal account?
A.  Not at first.
Q.  Okay, Did anyone review this transaction?

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    **F 9021-1.1.NOTICE.ENTERED.ORDER**

Did you have an attorney or any other person review this?

A.  No.

Q.  Why not?

A.  I did not do the darn transaction.  My husband did.  And he trusted Fred, he thought Fred was a friend.  [37:14-38:14]

Q.  Did you and your husband talk before this loan was actually made?

A.  I don't have any memory of it.

Q.  So you don't remember telling your husband that you approve of this loan?

A.  I have no memory of it.  [48:7-12]

Q.  Okay.  So let me ask you, was any of the money repaid as it was supposed to be?

A.  Not one penny.

Q.  Okay.  Why did you continue to loan money?

A.  I have no idea.

Q.  Do you think you were taken advantage of?

A.  Absolutely.

Q.  Why?

A.  At this point in time because they refused to not only pay it back, but the last time Fred Robbin [sic] was in our office he sat there beside me and I asked him again how the divorce of your brother [was] coming along and had the attorneys settled so we could be repaid and he gave me this song and dance, "No, the attorneys are working it out.  But, Jackie, if I have to file for bankruptcy I'll make sure you are taken care of."

And he left the office and went immediately and filed for bankruptcy that same day.  That told me he has no intention of paying back any other money he borrowed.

Q.  So Fred Robbin [sic] was going to pay you back with proceeds from his brother's divorce?

A.  He told me to my face and my husband was sitting there, "I'll see that you are taken care of, even if I have to file for bankruptcy."  And he went right from our office and filed for bankruptcy that same day.

Q.  And how do you know that?

A.  Because of the dates.

Q.  Okay.  Now, you just said that Fred Robbin [sic] was – he told you that he was waiting on the settlement of his brother's divorce?

A.  What?

Q.  Fred Robbin [sic] was waiting on the settlement of his brother's divorce to pay you back?

A.  According to him, the money we originally lent him was tied up in the bank of the Robbin Brothers in Santa Monica.

Q.  So the funds –

A.  And Al – his brother Al's wife who he was divorcing was not happy with the divorce settlement so she froze the bank account.  And supposedly our money was sitting in that bank in Santa Monica.

Q.  Okay.

A.  At last that is the insinuation that he gave me.  Because he kept saying they hadn't settled the divorce yet, they haven't settled.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                          F 9021-1.1.NOTICE.ENTERED.ORDER

Q.  So you think at the time that these loans were taken out that you were lied to?

A.  Huh?

Q.  At the time that they loans were taken out, do you feel that you were lied to?

A.  I don't know.

Q.  Do you think that things were concealed from you?

A.  Would you repeat that?

Q.  Do you think that anything was concealed from you?

Mr. Bowen: Do you understand the question?

The witness: Yes.

By Mr. Taran:

Q.  You do?

A.  Yes.

Q.  What was concealed?

A.  The fact that he told me at the beginning that they had billions sitting in the bank account with his brothers, the Robbin Brothers, and he couldn't touch it because Al's wife Dolores froze the account, bank account because she wasn't happy with the divorce settlement.  She thought she was entitled to more money.

Q.  And why do you think that's untrue?

A.  Because that's what I was told by Fred Robbin [sic] and –

Q.  Fred Robbin [sic] told you that was not true?

Mr. Bowen:  He denied ever saying it.

The witness:  All I know is I was told the money could not be touched until they finally settled the divorce.

54:16-57:22

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                    F 9021-1.1.NOTICE.ENTERED.ORDER

**Ex. 42**
**Gordon v. Mackey, Superior Court LC102166,**
**Trial transcript, August 25, 2015**

Q.  After you wrote the letter – and I believe it is June of 2013 – did you have occasion to ask Miss Mackey for information or how she was going to pay it back, when she was going to pay it back?

A.  Well, when Fred and Roberta would take us out to dinner, first thing I would ask them is how is the divorce handling going along for your brother Al.  It seems that they were at odds about her share – his share of the family business.

Q.  How did you learn that information?

A.  Roberta told me.

Q.  So when you asked the question how is the divorce lawsuit coming along, what was that designed to inquire?

A.  To find out when we would be repaid.

Q.  Why did the settlement of the divorce and the repayment have anything to do with each other?

A.  Our $100,000 check was placed in the Santa Monica bank account of the Robin Brothers.

Q.  Do you know why?

A.  No.  Well, yes.  The only thing I know of there was that Fred Robin does not have a bank account.

Q.  No, when the money was put into the account, what were the reasons given for not paying you back?

A.  The bank account was frozen.

Q.  And do you have any knowledge that the bank account was not frozen.

A.  Well, shortly after the $100,000 check from the East-West Bank cleared the bank, $100,000 was taken from that account at Santa Monica and placed in a bank account in Studio City under Roberta's name.  [116:25-117:27]

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                        **F 9021-1.1.NOTICE.ENTERED.ORDER**

**Ex. 43**
**Gordon v. Robin, U.S. Bankruptcy Court 1:14-ap-01169-VK**
**Trial transcript, August 27, 2015**

Q.  Okay. And with regard to the monies that Mr. Robin and Ms. Mackey borrowed from you, did you ever ask questions about being repaid the money that had been borrowed from you?

A.  Yes.  Every time we went out for dinner, I would ask, "How is the – your brother Al and his ex-wife settling their divorce problems?

Q.  Now, why would you ask about the divorce problems of Mr. Robin's brother Al and his ex-wife?

A.  Because we were under – I was under the understanding that our $100,000 loan was placed in the Robin Brothers bank account in Santa – Santa Monica.

Q.  And why was that a problem if it was ultimately placed in the Robin Brothers bank account in Santa Monica?

A.  Well, Al and his wife Delores and their attorneys were fighting it out because she didn't think she got her fair share of his share of the Robin Brothers business.  So consequently, the bank account where our money was supposed to have been deposited was frozen.

Q.  Now, all of this information that you've just shared with us, Ms. Gordon, came from whom?

A.  Came from Roberta Mackey.
212:9-213:5


Q.  Did you consider Ms. Mackey to be somebody you could trust before you made the loans?

A.  We were casual friends because of my husband's friendship with Fred Robin.

Q.  As with regard to Ms. Mackey did she treat you in a way that caused you to think she cared about you

A.  Yes.  She was always very solicitous, like honoring my old age.  214:15-22


Law and Analysis as to §523(a)(6)

Plaintiff's §523(a)(6) claim is for" willful and malicious injury."  The requirements

of "willful" and "malicious" are considered separately.  *Carrillo v. Su (In re Su),* 290 F.3d

1140, 1146 (9th Cir. 2002).  The plaintiff must establish the elements of each

requirement by a preponderance of the evidence. *See, e.g., Hopper v. Lewis (In re*

*Lewis)*, 551 B.R. 41, 51 (Bankr. E.D. Cal. 2016).

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    **F 9021-1.1.NOTICE.ENTERED.ORDER**

The Superior Court Judgment may have a preclusive effect on some of these issues. California law (the law of the state in which the judgment was rendered) determines the preclusive effect of a state court judgment. *Diruzza v. County of Tehama*, 323 F.3d 1147, 1152 (9th Cir. 2003)(quoting *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985)). Under California law, issue preclusion can be applied when: (1) the issue decided in the prior proceeding is identical to the issue sought to be relitigated in the subsequent proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the issue was necessarily decided in the prior proceeding; (4) a final judgment on the merits was issued in the prior proceeding; and (5) the party against whom issue preclusion is sought was a party to the prior proceeding. *Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (1990), *cert. denied*, 500 U.S. 920 (1991).

There is no question that the Superior Court Judgment was a final judgment on the merits and that Roberta was a party to the Superior Court Case. The open question is whether the Superior Court actually and necessarily determined an issue identical to one before this Court under §523(a)(6).

Even if this is the case, this Court has "broad discretion" in applying issue preclusion to the Superior Court Judgment:

> Bankruptcy courts "have exclusive jurisdiction to determine dischargeability of debts under §§ 523(a)(2) (fraud and deception); (a)(4) (fiduciary fraud, embezzlement, or larceny); and (a)(6) (willful and malicious injury to person or property)." *Ackerman v. Eber (In re Eber),* 687 F.3d 1123, 1128 (9th Cir.2012); § 523(c)(1). The effect of this rule is that "the bankruptcy court is not confined to a review of the judgment and record in the prior state-court proceedings when considering the dischargeability of [a creditor's] debt." *Brown v. Felsen,* 442 U.S. 127, 129–30 (1979). As the Ninth Circuit has instructed, "final judgments in state courts are not necessarily preclusive in United States bankruptcy courts." *Sasson v. Sokoloff (In re Sasson),* 424 F.3d 864, 872 (9th Cir.2005). In other words, while all federal courts have "broad discretion" in a decision to apply issue preclusion based on a state court judgment, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979), that discretion is

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    **F 9021-1.1.NOTICE.ENTERED.ORDER**

particularly expansive in exceptions to discharge under § 523(a)(2), (a)(4) and (a)(6). *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 904 (9th Cir.2001) ("Bankruptcy Courts have exclusive jurisdiction over nondischargeability actions brought pursuant to 11 U.S.C. § 523(a)(2), (4), (6) and (15).").

*Jenkins v. Mitelhaus (In re Jenkins),* 2015 WL 735799 at *9 (B.A.P. 9th Cir. Feb. 20, 2015). "[R]easonable doubts about what was decided in a prior judgment should be decided against applying issue preclusion." *Lopez v. Emergency Serv. Restoration, Inc. (In re Lopez),* 367 B.R. 99, 108 (B.A.P. 9th Cir. 2007)(relying on *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).


*Willful Injury*

"A 'willful' injury is a 'deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury.'" *Albarran v. New Form, Inc. (In re Barboza),* 545 F.3d 702, 706 (9th Cir. 2008)(quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original)).  At a minimum, willful requires "a deliberate act with knowledge that the act is substantially certain to cause injury." *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202, 1208 (9th Cir. 2001). The Court "may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action." *Ormsby v. First Am. Title Co. (In re Ormsby),* 591 F.3d 1199, 1206 (9th Cir. Cal. 2010)(citing *Su*, 290 F.3d at 1146).

Roberta's acts that potentially led to the Gordon's injury were signing the original note and depositing the $100,000 check in her bank account. There is no evidence that Roberta discussed this loan with William or with Jacquelynn prior to signing the $100,000 note.  According to Jacquelynn, prior to the $100,000 loan all discussions

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                          **F 9021-1.1.NOTICE.ENTERED.ORDER**

concerning it were solely between Fred and William.[21]  Roberta agreed that she had not discussed this with the Gordons.

The question is whether she acted "with knowledge that" her acts were "substantially certain to cause injury."  The Gordons argue that Roberta knew that her failure to repay the Gordons would result in injury to them.  But this is true of virtually any loan. The question is whether she knew at the time of the loan that a failure to repay was substantially certain.

Roberta asserts - without contradiction - that she did not discuss the terms of the loan with Fred although she did testify that at the time that she signed the note she asked Fred why he wanted to borrow the money and whether he could pay it back.  He assured her that he could.

(It is interesting that two years after the initial loan – and some twenty months after that was due – the Gordons loaned another $25,000 to Fred.  Roberta signed two of the notes, but there was no testimony as to Roberta's involvement in the formation of the two $10,000 loans and the $5,000 loan other than that the checks were endorsed to her and that she deposited them in her bank account.  For that reason, the Court granted judgment as to these three loans for the Debtor at the close of the Gordon's case-in-chief.)

The findings by Judge Kussman in the Superior Court Case appear to contradict Roberta's claim of a lack of involvement.

First, he held that the "Court finds that defendant Roberta Mackey knew or should have known that her conduct of borrowing $100,000 from plaintiffs on April 30, 2012, to be paid back in full within 90 days by August 1, 2012, was likely to be harmful

---

[21] Ex. 41, 37:7-11; 37:14-38:14.  William is incompetent to testify at this time and no evidence of his prior testimony was submitted to counter this.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    F 9021-1.1.NOTICE.ENTERED.ORDER

to the plaintiffs despite it being by agreement as **she** was unable to pay the same by its
due date." (emphasis added)  He found that this fell within the definition of financial
elder abuse as set forth in California Welfare & Institutions Code §§ 15610.30 and
15657.5(A).[22]

"Willful" under §523(a)(6) requires actual knowledge at the time of the act  in
question  - in this case the $100,000 loan.  The phrasing of this inferential finding under
the Welfare Code is such that it cannot be accepted as a final determination of
Roberta's actual knowledge – at the time of the loan - of likely harm to the Gordons.
The Superior Court imputed knowledge merely because the loan was *subsequently* not
repaid in a timely fashion. This Court has no evidence to support Roberta's actual
knowledge at the time that the loan was made and has been given no basis for Judge
Kussman's finding to that effect.

While there is evidence that Fred would likely have had trouble paying it back,
there is no evidence that Roberta knew the details of his financial affairs. Roberta
testified that at the time that she signed the note, she knew that Fred owed her about
$200,000 that she had previously loaned to his business. While there is testimony that
Roberta had no access to Fred's personal or business financial affairs – for example, he
received his bills at a post office box which was next door to his office and she did not
have a key to his office – she does not dispute that she was aware that his business
was in need of money. She also knew that he owed his ex-wife for support and that this
was in litigation.  But she also asserted that she did not know the amount and because
she and Fred had a pre-nuptial agreement, she did not ask about this.  Further, she
never asked when he would pay her back the $200,000 that he owed her.

---

[22] Ex. 26.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                    **F 9021-1.1.NOTICE.ENTERED.ORDER**

Furthermore, there is no evidence that Roberta lacked the ability to repay the $100,000 at the time the loan was made in the spring of 2012. In fact, the evidence shows that, in addition to access to the proceeds of her own insurance agency business, she had $30,000 of the $100,000 remaining in her bank account several months later.

In fact, it has not been established that Roberta was aware of the 90-day payment terms.  Roberta testified that she was only given the signature page by Fred and that she did not read the note and was not aware of the date for repayment.  She testified that she merely signed where told to – without seeing the actual terms of the note – and took the endorsed check and put it in her bank account.  Although the Court notes that there is a memo on the front of the check that reads "90 day loan," no testimony was elicited as to whether she saw this.[23]

Thus, the Court concludes that this first Superior Court finding does not determine the issue of Roberta's actual knowledge on the date of the $100,000 loan and that, even if it did, the Court will exercise its discretion and not give this first finding preclusive effect. Reasonable doubts about what was decided in a prior judgment should be decided against applying issue preclusion.

Second, Judge Kussman held that Fred was on the verge of bankruptcy and that Roberta knew that and thus, although she thought that the money could be paid back, there was no likelihood that it could happen within the 90-day window allowed by the $100,000 note:

> The fact that Mr. Robin was having financial trouble and on the verge of bankruptcy, an argument could be made that borrowing the money at that time – that when borrowing the money at that time, **they** must have known or should have known it was likely to be harmful to the Plaintiffs because it was likely **they**

---

[23] Ex. 2.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9021-1.1.NOTICE.ENTERED.ORDER**

weren't going to be able to pay it back.

       But you could make an argument, as Mrs. Mackey has, that, no, we could pay it back, but there is no reasonable likelihood to believe that it could have been paid back in 90 days.

       I don't think any reasonable trier of fact could conclude, given the evidence presented in this case, that borrowing a $100,000 from the Plaintiffs in April of 2012, even if there was property owned in Texas that may have been an asset that could be sold, no reasonable person signing that document under those circumstance … would say that the loan would be paid back in full in 90 days.

       The fact that the loan was for 90 days makes the Court conclude that the **defendants** should have known that the conduct was likely to be harmful to the Plaintiffs despite it being by agreement. [24] (Emphasis added)

The Court is confused by this ruling in that the Superior Court Case was solely against Roberta (and unnamed Doe defendants) and not against Fred Robin.  It was filed on September 24, 2014, about two months after Fred had filed his bankruptcy case (1:14-bk-13578-VK) and thus Fred was not included as a defendant.  However, Judge Kussman refers to the "defendants" or "they" and seems to be imputing knowledge of Fred's financial condition to Roberta.  Further, the loan was in April 2012 and Fred did not file bankruptcy until two-and-a half years later.  This Court has no evidence as to what happened in that period of time and why Judge Kussman would ignore that period of time, particularly when there were the three loans of May and June 2014, which definitely were made while Fred was on the verge of bankruptcy.

    Furthermore, Judge Kussman finds that they "must have known or should have known" while "willful" requires actual knowledge.

    Thus, the Court concludes that this Superior Court finding does not determine the issue of Roberta's actual knowledge on the date of the $100,000 loan and that, even if it did, the Court will exercise its discretion and not give this second finding preclusive effect.

---

[24] Ex. 25.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9021-1.1.NOTICE.ENTERED.ORDER**

As the Gordons have not established that Roberta signed the note and endorsed the check "with knowledge that" these acts were "substantially certain to cause injury" to the Gordons, the "willful" requirement of §523(a)(6) has not been met.

*Malice*

"A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause." *Ormsby*, 591 F.3d at 1207.

The Gordons argue that Roberta's "wrongful" act was obtaining $100,000 from the Gordons, when she knew that she and Robin could not repay this loan. They argue that the act was "intentional" and "necessarily caused injury" based on that same knowledge of inability to repay.  However, as set forth above, the record does not establish that Roberta had that knowledge at the time of the loan.

The Gordon's argue that "lack of just cause" is shown from Roberta's failure to take steps to repay the loan.  However, the act in question under §523(a)(6) occurred when the $100,000 loan was made.  So Roberta's activities months or years later are irrelevant.

The Gordons also argue that the Superior Court's ruling that Roberta committed financial elder abuse in violation of the Cal. Wel. & Inst. Code could be the basis for malice.  (They likewise argue that malice is supported by Roberta's commission of conversion; civil conspiracy; and fraud, oppression, malice and/or misrepresentation.) However, as set forth above, the Gordons have not established that Roberta had actual knowledge (or even reason to know) at the time of the $100,000 loan that the loan was unlikely to be repaid. Thus, with respect to that loan Roberta is only a borrower who

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9021-1.1.NOTICE.ENTERED.ORDER**

failed to repay. This shows breach of contract, but not that additional element of tortious

conduct required for malice under §523(a)(6).


*Other Evidence*

    The Court is left with some loose ends.

    One of the issues that was raised in discovery and the Superior Court Case trial

dealt with the assertion that Fred could not reach the money to repay the Gordons since

Fred's ex-sister-in-law had tied up the business account of Robin Brothers.  There was

oral argument at one time that hinted that the loan was to tide over the business until

the divorce proceedings were completed.  But the testimony of Jacquelynn (from her

deposition and the prior trial) shows that the divorce was used as a reason for the delay

in repayment, not as a purpose for obtaining the loan.  In fact, it was her understanding

that the money initially had gone into the Robin Brothers bank account, which was later

frozen, and thus the money could not be refunded.[25]

    At trial, Fred testified that he needed the $100,000 as "bridge money" while he

sold some assets.  He told William that he had some insurance payments to make and

other business expenses.  Fred testified that he believed that he could repay the

$100,000 in a timely manner, but realized before the loan came due that he could not.

So he asked William for an extension until at least February 2013, which William agreed

to.  In February 2013, Fred told William that he could not pay him back and proposed a

payment plan.  William agreed to deferred payments and just said that Fred should pay

him back when he could.  In April 2014, Fred told William that he was in dire financial

straits and needed $25,000 to pull himself out and that he might have to go bankrupt.

---

[25] Ex. 41, 30:12-14; 30:22-31:3; 37:14-38:5, 56:2-15- 57:22.  Ex. 42, 116:25-117:27.  Ex. 43, 212:9-213:5.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                          **F 9021-1.1.NOTICE.ENTERED.ORDER**

William loaned him the money in three pieces.

The Court is not convinced that this is the full story and William is unable to provide his side of the story.  But, actually, it is irrelevant to the trial before this Court since, as noted above, the testimony of Jacquelynn does not show that she and Roberta ever discussed the loan before it was made.  And there is no evidence of such discussions between William and Roberta.[26]

There is also a variety of testimony about the freezing of the Robin Brothers bank account, but no actual evidence that this occurred or when.  As noted above, Jacquelynn's testimony shows that the freezing of the bank account was not a stated reason for the loan – just an excuse for delay of repayment.  However, the Court is concerned that Roberta testified that repayment was never mentioned when she and Fred went out to dinner with the Gordons, which they did every few months.  This is both unlikely and a direct contradiction to the testimony of Jacquelynn, who tied the discussions of the brother's divorce in with the timing of repayment.  At most the Court could find that Roberta was knowingly involved in the delay of the repayment.  But this would only be if the story of the frozen bank account was not true – and there is no evidence that it was false.

The Superior Court transcript shows that there was some land in Texas that Fred was, apparently, intending to sell.  No evidence of this was put before this Court.  It is important to note that Ex. 25 (which is the Superior Court transcript) has only 7 pages – the cover, p.1, pp. 54-57, and the reporter's certification.  In his closing brief Mr. Lally extensively quotes from pp. 49-53, none of which are in evidence.  While interesting and relevant, these are not being considered.  Similarly, Mr. Lally refers to other evidence

---

[26] Ex. 41, 30:12-14.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                        F 9021-1.1.NOTICE.ENTERED.ORDER

which was either not admitted (Ex. 27, only the first page was admitted) or to testimony

that was not given in this trial (that Roberta communicated with the managing partner of

the Texas LLC and had received an email that they would buy her real estate for

$100,000).  None of this is being considered as evidence.


*Conclusion*

The Court cannot find that Roberta acted willfully or maliciously at the inception

of the $100,000 loan. She did not assert anything about its use or its repayment. At

most, she signed the note and was or should have been aware of the repayment date

due to the note and/or the memo on the check.  While she knew that Fred owed her

money and that there was a suit that might end up creating a debt to Fred's former wife,

there is no evidence that in April 2012 she knew or had reason to believe that Fred

would be unable to timely repay the $100,000 note.  And it appears that even the

Gordons were satisfied about a delay and suffered no damages from that in that no

demand for repayment was made until June 2013.


### RULING

Judgment will be granted to the Debtor on both the §727(a)(4) and the §523(a)(6)

causes of action.


### Date: January 4, 2017

Geraldine Mund
United States Bankruptcy Judge

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                    **F 9021-1.1.NOTICE.ENTERED.ORDER**